W. Y. BENGE, Jr., Appellant,

v.

H. M. KNIGHT, Executor of the Estate of W. Y. Benge, Sr., Appellee.

No. 10543.

Court of Civil Appeals of Texas.

Austin.

Jan. 29, 1958.

Rehearing Denied Feb. 19, 1958.

Murray J. Howze, Monahans, for appellant.

Wilson, Logan & Lear, San Angelo, Worth B. Durham, Sterling City, for appellee.

HUGHES, Justice.

This suit is by appellant, W. Y. (Mack) Benge, Jr., against the estate of his deceased father, W. Y. Benge, Sr. H. M. Knight is Independent Executor of such estate. The suit is upon a promissory note executed by deceased payable to appellant in the sum of $12,000 dated July 15, 1954, due on or before July 15, 1955, bearing interest from date at the rate of 5% per annum and containing a 10% attorneys' fee clause.

The only defense pleaded by appellee is that the note in suit was without consideration.

It is stipulated that a claim based on the note was duly presented to appellee and by him rejected.

The case was tried to a jury which found that the note was not given by W. Y. Benge, Sr. for money theretofore borrowed by him from and then owing to W. Y. Benge, Jr.

Appellant has three points all of which question the presence of any evidence of probative value to support the verdict of the jury.

Appellant, in his brief, devotes 14 pages to a discussion of the authorities supporting his points and 3½ pages to what he terms "a fair résumé of all pertinent evidence."

The statement of facts has 177 pages of oral testimony and 26 pages of exhibits.

Appellant testified that the note sued on was in renewal of an original note given in 1950 and was based on two transactions with his father (1) a loan to him of $5,000 in 1950 for the purpose of buying the "Ray Place" and (2) a loan to him of $7,675 in 1946 or 1947 evidenced by a draft on the Texas Production Credit Association.

In view of appellant's cursory treatment of the statement of facts we will not detail the evidence which, in our opinion, fully supports the verdict of the jury. We will, however, give an outline of the evidence favorable to appellee which we have formulated from a close reading of the statement of facts and an examination of the attached exhibits.

Appellant did not mention the existence of this note to his banker, his income tax accountant, his mother-in-law nor to anyone else whose name he could recall prior to the death of his father. Nor did his father mention the note to his wife, banker or accountant or to any other known person prior to his death.

On cross examination appellant testified:

"Q. And it is your statement that the money paid to him in 1950 was not for the steers that you mortgaged in 1949? A. The money that I let him have in 1950 was a loan.

"Q. All right; and at the same time you were lending him money in 1950 he was lending you money and paying your checks? A. That is correct; it sounds a little funny but I expect it's correct; that went on considerable, a good deal.

\* \* \* \* \* \*

"Q. And all during the time that your father owed this money he was lending you money, is that correct? A. Yes, sir, I got money off of him constantly."

Executor Knight was the principal witness for the estate. He had been connected with the First National Bank of Sterling City in various capacities for many years. Both appellant and his father were long time customers of the bank. Mr. Knight was not only familiar with the banking affairs of Senior and Junior Benge but

he had acquired a much more intimate knowledge of their financial affairs in, for many years, making their income tax returns.

Regarding the $5,000 payment to Mr. Benge by appellant in 1950 appellant had testified that in 1948 his father had sent some steers to appellant's place in New Mexico referred to as the "Moore cattle" and that he, appellant, had mortgaged the steers to the Albuquerque Production Credit Association and that when the steers were sold he benefited to the extent of $4,700.

There is no evidence that this sum was repaid other than the 1950 check except that appellant proved a check dated October 18, 1949, from the Albuquerque Production Credit Association for $2,589 payable to himself and endorsed to his father. As to this Mr. Knight testified:

"Q. Now, in connection with the payment of the Moore steers, cattle, what about the $2589.00 that Mack Benge paid to Moore; do you have a recollection of that? A. That Mack Benge paid to Moore?

"Q. Yes, sir. A. No, I don't.

"Q. Do you remember him making any such payment to his father at the time his father gave the check to Moore? A. No, he made a payment to his father there, I believe, in December, of $2589.00 but I believe that was in connection with the Ellis contract, rather than the Moore cattle."

This testimony was not denied by appellant although he had previously testified that he had "paid him that check ($2589.-00) from the sale of the steers." This statement was ambiguous since the "Moore" and "Ellis" steers were sold at the same time, Mr. Benge, Sr. owning the "Moore" cattle outright and having a 20% interest in the "Ellis" cattle.

Mr. Knight testifying further regarding the $5,000 check stated:

"A. * * * I went into the records and my own recollection, and as I entered it on this income tax return there, I think, it was—he was paying his father back for the loan when he had sold those cattle up in New Mexico that they bought, Mr. Moore put up the original money to buy.

"Q. And that was the conclusion you reached from the records examined at the time? A. Yes.

*   *   *   *   *   *

"Q. Well, was that what the records reflected to you, based on what notes you had made and the bank records? A. Yes."

Further refuting appellant's version of the $5,000 check Mr. Knight testified that when the check was given "Mr. Benge didn't need the money. When he paid for the Ray place he had $17,000.00 in the bank, if you will look at the statement here."

The $7,675 draft which appellant testified was a loan and entered into the note was explained by Mr. Knight relying principally upon a memorandum which he prepared at the time of the transaction at the request of appellant and his father, such memorandum being based upon a written statement prepared by and handed to him by appellant, such statement appearing in the record. We will quote some of Mr. Knight's testimony regarding this transaction:

"Q. Did you compile Defendant's Exhibit No. 2, that is in your figures, from the information furnished you by the plaintiff on Defendant's Exhibit No. 1? A. Entirely.

"Q. And for what purpose did you prepare that, Mr. Knight? A. They had sold the store and they done some selling in livestock and wanted to divide their money.

"Q. All right; and the plaintiff furnished you those figures for that purpose? A. That is right.

"Q. And was the money divided between them, based on those figures? A. Yes.

"Q. All right; was there anything at that time said by the plaintiff about the store not being a partnership between he and his father? A. No. If I might add this: He told me that he would like to take all the money and invest it, he thought he could do better with it than his father could.

"Q. I see. Was there anything or not said about the store money not belonging half to his father and half to him? A. Well, they were neither too satisfied with dividing half and half, each thought they ought to have more than that.

\*   \*   \*   \*   \*   \*

"Q. And on the basis of the figures you prepared a 50-50 division of the store and the livestock, is that correct? A. That is right.

\*   \*   \*   \*   \*   \*

"Q. All right. I believe you stated that the plaintiff told you about that item of money as being lent to his father some time in June or July of 1955 when you went over to the bank, is that correct? A. That is when he told me, yes.

"Q. All right; and you did investigate that in the records over at the bank and in Mr. Benge, Sr.'s records, and what conclusion did you reach about that, Mr. Knight? A. Well, it was a 50-50 partnership and that was Mr. Benge's part of it from the partnership is what—the conclusion I reached.

"Q. And the $7625.00 then belonged to Mr. Benge? A. Yes, sir."

Income tax returns were prepared by Mr. Knight showing the store to be a partnership 80% for appellant and 20% for Mr. Benge, Sr. However, when the store was sold the proceeds, according to Mr. Knight,

were evenly divided and this he explained as follows:

"Q. I believe the plaintiff testified that the partnership (store) was made up on a 20 per cent, 80 per cent basis, 80 per cent to him and 20 per cent to Mr. Benge; do you recall that or not? A. How that thing came about, they each took a living, got their living out of the store, and then the other was to be divided, to be divided equally, and the store, just about all it provided was the living.

"Q. I see. A. And had we divided it equally, why, Mack would have had the living and Mr. Benge, he would have owed Mr. Benge, then, money, or if we made a return showing that divided equally, so we had to divide it so that each one—that is what they actually got out of the store, and so that is the way we divided it, and it just happened to work out about an 80 to 20, and we had to show in our return the interest, and that was the way they divided it and that is the way we showed the interest.

"Q. In other words, they took everything out of the store in living? A. Yes, during those years.

"Q. And Mack's living expenses and withdrawals were greater than Mr. Benge's? A. Yes, that's right."

The proceeds from the sale of the store appear to have been $9,000 which was evenly divided. The other items making up the $7,675 settlement are not controverted except by appellant's generalization that the whole amount was a loan and we will not undertake a specific discussion of them.

Although appellant testified that his father paid him interest on the note there are no records to substantiate this and no interest was ever reported on the income tax returns of appellant prepared by Mr. Knight.

There is more than a suggestion in the record that the note in suit and its prede-

cessor were executed by appellant's father for the purpose of bolstering appellant's financial statement for use in obtaining credit from lending institutions.

We are firmly convinced that the verdict of the jury is amply supported by solid, substantial evidence. It would take much weaker evidence than this to persuade us to overturn a jury verdict in Sterling County returned in settlement of a controversy between parties of long residence and good standing in the community.

The judgment of the Trial Court is affirmed.